Jake O. JOKI, Plaintiff,

v.

Arthur S. FLEMMING, Secretary of Health, Education, and Welfare, Defendant.

Civ. No. 231.

United States District Court
D. Montana,
Billings Division.

Nov. 30, 1960.

Jones, Olsen, Dowlin & Pease, Billings, Mont., for the plaintiff.

Krest Cyr, U. S. Atty., Butte, Mont., and John F. Blackwood, Asst. U. S. Atty., Billings, Mont., for defendant.

JAMESON, District Judge.

This is an action under section 205(g) of the Social Security Act, as amended, 42 U.S.C.A. § 405(g), to obtain a judicial review of a final administrative determination by the Secretary of Health, Education, and Welfare that plaintiff is

not entitled to have a "period of disability" established under section 216(i) of the Act, 42 U.S.C.A. § 416(i).[1]

Defendant has moved for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The motion is based on the pleadings and the transcript of proceedings before the Social Security Administrator.[2]

On February 28, 1956, plaintiff applied to the Social Security Administration, Bureau of Old Age and Survivors Insurance, for the establishment of a period of disability from July 1, 1953, claiming to be disabled under the Act by reason of coronary insufficiency or a weak heart. On October 24, 1956, the Secretary determined that plaintiff was "not under a disability of sufficient severity to qualify for disability freeze".[3] Plaintiff filed a request for reconsideration, which was denied. A hearing before a referee of the Department of Health, Education, and Welfare was had on August 20, 1958.

The decision of the referee, dated September 29, 1958, finding that plaintiff was not entitled to a period of disability, was made final by a denial on June 22, 1959, by the appeals council of the Department, of plaintiff's request for review.[4]

Under section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, * * *."

The pertinent portions of plaintiff's testimony before the referee may be summarized as follows:

He had a seventh grade education and was employed from 1942 to 1951 as an electrician. In 1951, while on vacation in the Big Horn Canyon near Hardin, Montana, he was suddenly taken ill and subsequently hospitalized at Hardin, for a heart attack or pneumonia.[5] As soon as he felt he could be moved he went to Spokane, where he was confined in St. Luke's Hospital for a period of forty days.[6] He has suffered from a heart condition since August 15, 1951, (when he was 49 years of age) which has prevented him from engaging in any employment whatsoever. In February, 1952, he was brought from Spokane to Red Lodge, Montana, by his brother-in-law who was to take care of him. He was treated by doctors several times but was not hospitalized again until October,

1. This section, the so-called "disability freeze" provision, was enacted to protect a wage earner's old age and survivor's insurance rights against impairment of his earning capacity through disability before reaching the retirement age. A wage earner must show continuous disability for six months or more which began at a time when he had the required quarters of coverage, as defined in section 213 of the Act (42 U.S.C.A. § 413), ending with the first quarter of disability. The plaintiff last met this quarters of coverage requirement in the quarter ending June 30, 1953.

2. Section 205(g) gives the court the power to enter, upon the pleadings and transcript, a "judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing". The same section requires the Secretary to file as a part of its answer a certified copy of the transcript, including the evidence upon which the findings and decision complained of are based.

3. Section 216(i) (1) defines "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration".

4. Under regulations (20 CFR § 403.710(e) (1949) the referee's decision became the final decision of the Secretary within the meaning of section 205(g) of the Act when the appeals council denied plaintiff's request for review.

5. Records of the Big Horn County Community Hospital, at Hardin, show that plaintiff was a patient from August 15, 1951, to August 31, 1951, that he was treated by Dr. R. O. Yeatts, and that the diagnosis was "muscle strain-thoracic portion of spine and possible coronary occlusion".

6. Records from St. Luke's Hospital confirm that plaintiff was a patient from September 3, 1951, to October 12, 1951.

1957. During that interval, for the most part, he lived by himself, cooked his own meals and did his own housekeeping. He was able to drive a standard shift automobile, a 1952 Plymouth. He had gone fishing for three or four hours in a day on occasion, but is no longer able to do so. He went deer hunting in 1952 and 1956, but in 1956 was gone only twenty minutes, and his cousin Jacob Paavola helped him carry the deer that he shot.

With regard to a deer hunting expedition in 1957 plaintiff testified, "Well, I felt a little better a year ago last fall there. I went deer hunting and I didn't tramp around in the woods like you would think a deer hunter would do but I drove the car up down there where I could sit in the brush and wait until somebody drove a deer up to me. I probably was out there six hours or so but I didn't walk over two miles on the whole day. I just sat around there and I got a deer and I dragged that thing to the car and took care of it and that was too much." As a result of this hunting activity he suffered a second heart attack which necessitated hospitalization.

At present he is required to spend from twelve to fourteen hours a day in bed and would not be able to engage in sedentary type of work requiring sitting up for eight or ten hours, and mental concentration and even talking for substantial periods wear him down. He can do minor electrical work around the house like replacing a light switch, fuses, etc., and would be glad to do such work for his relatives, but there isn't much of that type of work to do.[7]

Jacob Paavola, plaintiff's cousin and life-long friend, and Mrs. Lina Elizabeth Hertin, his sister, both corroborated in part plaintiff's own testimony regarding his condition and activities.

As summarized in the referee's decision, the medical evidence of record consists of the following:

"A statement from the Big Horn County Community Hospital of Hardin, Montana, dated April 8, 1957 and signed by Ursula E. Zelka, R. N., Supertindent (sic.) (Exhibit No. 19) shows the claimant was hospitalized there from August 15 to August 31, 1951, and that the claimant was treated by Dr. R. O. Yeatts with a diagnosis of Muscle strain-thoracic portion of spine and possible coronary occlusion.

"An Abstract of Hospital Record of St. Luke's Hospital, Spokane, Washington, to Jacob Joki dated April 18, 1957 (Exhibit No. 18) states the claimant was hospitalized there from September 3 to October 12, 1951. This abstract shows the following complaint and history: Pain, L. chest radiating to L. arm; dyspnea; onset about two weeks before admission; hospitalized in Montana at the time. X-ray Diagnosis: 9/4/51: Cardiac enlargement, with L. ventricular hypertrophy: pneumonitis, prob. secondary to bronchiectasis, R. Base; thicken-

---

7. The entire testimony of the plaintiff with respect to his ability to do electrical work reads:

"Q. One other thing. Do you do any of the repairs around the house in the way of electrical work? If a socket should be * * * A. Yes, I can do a little work like that.

"Q. A switch? A. Yes, I can do a little work like that.

"Q. Do you do that sort of thing? A. Yes, but I never charge nobody nothing for it.

"Q. I am not talking about charging. Do you do it though, to help when the switches go out? A. Oh, yes, and I can put in a fuse and so forth, and do a little work. I'm not that helpless.

"Q. Do you do that for your sister and cousins that live around? A. Well, there isn't much work to be done that way, but if there is occasion for it, yes. I would be glad to do it to have something to do to break the monotony.

"Q. You feel you could do that sort of thing? A. Well, if it don't last too long. I can't go up and do small repairs all day long but I can do one little job there for a half hour or an hour or so and take my time about it. I'd say yes; I can do that much."

ed pleura, R. side. Electrocardiogram, September 3, 1951: Anterior wall infarction. Electrocardiogram, September 17, 1951; Healing infarct. The final diagnosis was anterior myocardial infarction; complicated by pneumonitis, R. base.

"A medical report from Dr. James J. Kane, Red Lodge, Montana, dated March 2, 1956 (Exhibit No. 4) states that he first saw the claimant November 11, 1952, and continued seeing the claimant approximately every 6 months until March 2, 1956, the date of the last examination. The history contained in this report indicates a coronary occlusion in 1951, that the applicant became unable to work on August 15, 1951, and that there is no previous history of this illness. The present condition shows substernal chest pain on exertion to any extent, electrocardiogram changes consistent with coronary insufficiency and old myocardial infarct and patient is ambulatory. Blood pressure is shown as 142/90; functional cardiac capacity is Class 3 with marked limitation; no dyspnea or edema, but claimant gets angina on exertion. Claimant on metomine tablets after meals and at bedtime. Diagnosis: Coronary Sclerosis, old coronary infarct.

"A letter from Dr. Milton H. Coutu of Red Lodge, Montana, dated January 9, 1957, addressed To Whom It May Concern (Exhibit No. 9) certifies that he attended the claimant on February 6, 1952, May 12, 1952 and July 16, 1952 and that on these dates he was suffering from a coronary occlusion and was totally disabled and unable to perform any work whatsoever for an indefinite period.

"An additional letter from Dr. Coutu to the Social Security Administration dated March 28, 1957 (Exhibit No. 20) confirms the information given in the letter dated January 9, 1957 (Exhibit No. 9) and further states the doctor saw the claimant on August 29, 1952, September 4, 1953 and September 10, 1954, for insurance purposes and on those dates the claimant was still totally disabled and unable to perform any work whatsoever and for an indefinite period.

"A medical report from Dr. G. R. Brosius of Billings, Montana, dated December 19, 1956 (Exhibit No. 10) shows no previous history of the illness but that it occurred in August 1951 at which time the applicant became unable to work. This physician states he saw the patient only once, on December 19, 1956, but that the claimant was seen in 1952 by another doctor who has since expired. The present condition, as stated on this report, shows the claimant to be ambulatory, with symptoms of weakness, palpitation and some probable angina. Electrocardiogram shows extensive old anterior myocardial infarction. The heart is not enlarged. The diagnosis is given as arteriosclerotic heart disease with old myocardial infarction and probable angina pectoris, anxiety state and also an irritable colon. The report states the condition is apparently static with no improvement expected. The cardiac functional capacity is listed as Class 3 with marked limitation; blood pressure 128/80; no edema but dyspnea on moderate exertion. The doctor advised the claimant should not engage in strenuous work and further stated: 'This man is emotionally unable to work—He has heart disease that limits his activities and the emotional problem limits what he could do even more.'

"A statement by Dr. Fred E. Harvey of Spokane, Washington, dated January 11, 1952 and furnished to the Pacific Mutual Life Insurance Company (Exhibit Number 15) shows that the claimant was totally disabled and continuously prevented from engaging in any occupation on August 15, 1951, because of a cor-

onary occlusion and pneumonia, that this physician had not previously attended the claimant but did treat him in St. Luke's Hospital from September 3 to October 12, 1951, after which date the claimant was confined to his house. He stated the total disability would continue until six months from date of onset (which was August 15, 1951).

"A statement by a Billings, Montana physician, dated October 7, 1952, and furnished to the Pacific Mutual Life Insurance Company (Exhibit Number 16) shows this doctor saw the claimant on September 29 and 30, 1952, in his office, at which time the patient was confined to his house. Patient gave a history of hospitalization in Hardin for 16 days in August of 1951, out for 4 days and then hospitalized again for 40 days in Spokane, Washington, and also stated that history dated back to August 1951 when he was ill with pneumonia. From the electrocardiogram examination the physician stated it would appear that the claimant would be incapable of performing any strenuous activity, that the claimant suffered from an anterior coronary infarct in all probability from the appearance of the electrocardiogram, and that it is his opinion that the claimant is permanently disabled as far as physical activity is concerned, but that there is a possibility that the claimant may be able to do very light work in due time, but the physician believed the prognosis to be poor. The physician diagnosed his disease as coronary occlusion, probably (sic.) anterior infarction and residuals of decompensation such as capacity of congestion of the liver, symptoms of pains shifting through the chest, but more constantly in the left precardial region.

"In a letter to Jacob Joki, dated April 17, 1957, (Exhibit Number 17) Dr. James J. Kane, of Red Lodge, Montana, stated that the report to the insurance companies should have shown the claimant to have angina pectoris and that he thinks this type of illness should be sufficient to have social security to the claimant frozen."

The findings and conclusions of the referee are as follows:

"The evidence of record shows that the claimant suffered from an acute attack in August 1951 and was hospitalized and treated for muscular strain-thoracic portion of the spine and possible coronary occlusion which was later complicated by pneumonitis. Dr. G. R. Brosius examined the claimant December 19, 1956, and in a medical report stated that the electrocardiogram showed an extensive old anterior myocardial infarction but that the heart was not enlarged. The Referee concludes that although the claimant suffered an infarction in August 1951, the condition of the claimant's heart had improved by December 1956.

"The evidence of record and the testimony establishes that the claimant had the residual capacity to perform substantial gainful activity. The claimant in 1956 and 1957 had the physical capacity to take hunting trips and in 1957 the claimant felt that he had the physical strength to drag a deer to his automobile.

"At the time of the hearing the claimant was able to drive a shift model automobile, prepare meals, keep care of his apartment and do a little electrical work such as fixing a switch or light socket. After a careful consideration of the entire record the Referee is of the opinion that the claimant had the residual capacity to engage in substantial gainful activity.

"While the evidence shows that the claimant suffered certain impairments, it is the finding of the Referee that the limitation resulting from them does not meet the statutory test. * * * The Referee fur-

ther finds that the claimant failed to establish that he had a medically determinable disability of such severity as to prevent the claimant from engaging in substantial gainful activity commencing prior to July 1, 1953, the time he last met the earnings requirements, and continuing without interruption to the date his application to establish a period of disability was filed, February 28, 1956. * * * "

Is there substantial evidence to support the referee's finding that plaintiff failed to establish a medically determinable disability of such severity as to prevent him from engaging in substantial gainful activity?[8] The scope of review in resolving this question was well stated by Judge Kaufman in Jacobson v. Folsom, D.C.S.D.N.Y.1957, 158 F. Supp. 281, 284, as follows:

"Under Section 205(g) of the Social Security Act 42 U.S.C.A. § 405(g) the findings of the Secretary as to any facts if supported by substantial evidence are made conclusive on the courts and a hearing de novo may not be had on the evidence. (Citing cases) But it was never intended that the courts should abdicate their 'conventional judicial function' to review. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456. Where the administrative decision is based upon conclusions not reasonably reached upon due consideration of all the relevant issues presented or where the parties have not been given a fair opportunity to be heard upon the facts and applicable law the court may properly correct the errors below. Goldman v. Folsom, 3 Cir., 1957, 246 F.2d 776; Wilson v. Folsom, D.C.D.N.D.1957, 151 F. Supp. 195."

In the initial disability determination it was recognized that, "This is perhaps a border-line case", but it was determined that "the medical evidence does not establish a degree of severity necessary to show a total disability". The statutory test is "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration". The phrases "total disability" and "total and permanent disability" are often used interchangeably with the definition of "disability" which appears in the statute. Whatever the terminology, the statutory definition controls and must be kept in mind. The referee applied the correct test in reaching his conclusion. In the absence of more explicit findings of fact, however, it is necessary to scrutinize the evidence carefully to determine whether the referee's conclusion was reasonably reached upon due consideration of all relevant issues and a proper construction of the meaning of the term "disability" as used in the Act.

The defendant in his brief comments on the evidence as follows: "However, the evidence produced before the Referee of his (plaintiff's) physical condition and alleged inability to work in substantial gainful employment in that period shows that after the expiration of the last date on which he met the quarters of coverage requirement (June 30, 1953), he occasionally plied his trade as an electrician to help his friends, exerted himself considerably on hunting and fishing trips, and generally was able to do light housekeeping chores." And later in the brief appears this statement: "This plaintiff was an electrician by trade and the limitation of non-strenuous work did not preclude him from doing electrical work, bench work and allied trades. * * * Currently, he has been doing odd electrical jobs for his friends, and his activities, aforementioned, prove that light

8. It is well settled that the burden of proof rests upon the plaintiff to establish the required conditions of eligibility.

This rule was recognized by this court in Dowell v. Folsom, 1957, 157 F.Supp. 46–50.

to moderate pursuits did not cause cardiac embarrassment".

There is no evidence that plaintiff was in fact employed at any time within the period in question. The referee found that he was able to "do a little electrical work such as fixing a switch or light socket". This conclusion was based on the testimony set forth in detail in note 7. Neither the testimony nor the finding supports defendant's contentions that plaintiff "occasionally plied his trade as an electrician", that he "generally was able to do light work", that he was not precluded "from doing electrical work, bench work and allied trades", or that currently "he has been doing odd electrical jobs for his friends". This argument of counsel apparently is an attempt to bolster defendant's position by inferences and conclusions which do not reasonably follow from the actual testimony or finding. It points up the inherent weakness in the referee's conclusion that plaintiff has failed to show inability to "engage in any substantial gainful activity".

No medical testimony was offered on behalf of the defendant; nor did any physician testify personally at the hearing on behalf of the plaintiff. The medical testimony consisted of written reports from five physicians, some of which were copies of reports submitted to an insurance company in support of plaintiff's claim for disability under a policy of insurance. On the basis of those reports, plaintiff has been receiving $30 per month from the insurance company since 1951.

The medical testimony before the referee was fairly summarized in his decision as set forth above. Subsequent to the referee's decision, the appeals council received a supplemental letter from Dr. James J. Kane of Red Lodge, which was included in the transcript as an exhibit under the heading "Appeals Council List of Exhibits". In this letter, dated September 26, 1958, addressed to "Whom It May Concern", Dr. Kane explained that he did not classify plaintiff as "Grade IV because the classification places this grading on individuals who are so incapacitated that they are un-

able to do any exertion and are considered as cardiac invalids who are for the most part bed-fast". The letter concludes: "I do wish to point out that in my opinion Mr. Joki's condition is a severe enough one and has been since 1951 to keep him from being gainfully employed and that for all practical purposes he is totally and permanently disabled. In other words this man will never be able to carry on his chosen profession again and by training he has no other occupation which would be compatible with his severe physical handicap. Therefore he cannot be gainfully employed and must be considered for practical purposes totally disabled."

Defendant argues that "little significance can be given, in considering whether or not the plaintiff has met the burden of proof that he is totally and permanently disabled, to the opinions and conclusions of doctors on this issue". While it is true, as defendant contends, that the administrative agency has the ultimate responsibility of determining the issue of "disability" as defined by the statute, expert opinions of qualified physicians on this issue, though advisory and not controlling, should be considered with all other relevant evidence by the finder of facts. The rule here applicable was well stated in Hill v. Fleming, D.C. W.D.Pa.1958, 169 F.Supp. 240, 245: "Expert opinions on such issues are admissible evidence to be considered by the fact finder, but when they are not repudiated in any respect by substantial evidence to the contrary, an adverse decision on these ultimate facts should be set aside as based on 'suspicion' and 'speculation'." This language was adopted and quoted with approval in Kohrs v. Flemmining, 8 Cir. 1959, 272 F.2d 731, 736.

█ In the instant case, in my opinion, there is no substantial evidence contrary to the opinions expressed in the medical reports. Accordingly, we are concerned primarily with a consideration of what constitutes "disability" within the meaning of the Act.

█ Complete helplessness is not necessary to a finding of an allowable dis-

ability. On the other hand, the claimant must be disabled not only for his usual occupation, but also for any type of "substantial gainful activity". The claimant's age, training, and experience must be considered in determining what activities, if any, are open to him. "He is not required to sell apples or to start his own business".[9] At a hearing before the Committee on Finance, U. S. Senate, 84th Cong. 2d Sess. on H. R. 7225—the Social Security Amendments, in answer to questions raised by Senator Byrd, the Committee chairman, the Social Security Administration submitted a statement setting forth its stand on the disability freeze provisions, which reads in part (page 43 of Hearing Report): "Substantial gainful activity means the performance of substantial services with reasonable regularity in some competitive employment or self-employment. It relates to the range of activities the individual can perform * * * complete helplessness is not necessary to a finding of an allowable disability. *Sporadic or infrequent activity would not necessarily establish ability to engage in substantial gainful activity.*" (Emphasis supplied) (Taken from Adams v. Flemming, D.C.D.Vt.1959, 173 F.Supp. 873, 879.)

The meaning of the term "disability" was considered by Circuit Court Judge Rives sitting in the District Court of Alabama, in Aaron v. Flemming, 1958, 168 F.Supp. 291, 295: "It is further apparent that the referee gave too strict an application to 'disability.' Even though the Act is worded in strong language and the Congressional history indicates a strict policy of application, to conclude in this case that the plaintiff is not 'disabled' within the meaning of the Act would make 'disability' commensurate with 'helplessness,' 'bed-ridden,' or 'at death's door.' No matter how infirm, or disabled, or sick a man is, if he still possesses some of his faculties and some degree of mobility, he is not in the strictest sense unable to perform '*any* substantial gainful activity.' I do not interpret the Act to apply only to the totally helpless and bed-ridden or to those at death's door. If a wage earner has the inability to engage in 'any substantial gainful work' which is commensurate with his education, training, experience, and physical and mental capacities, then he should be given the benefit of the 'disability freeze.' "

In construing the statutory definition of "disability" in Dunn v. Folsom, D.C. W.D.Ark.1958, 166 F.Supp. 44, 49, the court said, "It should also be noted that the word 'substantial' as used in Secs. 416 and 423 does not modify 'gainful', but rather modifies 'activity.' The activity in which the plaintiff must be able to engage must not only be 'gainful' but it must also be 'substantial.' The determinative factor here is not how substantial the gain is, but how substantial the activity is in which the plaintiff could gainfully engage."

Chief Judge Biggs of the Third Circuit, sitting in Klimaszewski v. Flemming, D.C.E.D.Pa.1959, 176 F.Supp. 927, 932, in determining the sufficiency of the evidence to sustain the Secretary's denial of disability benefits, construed the word "any" as used in the definition of disability: "The claimant's proof that he is not qualified to engage in any substantial gainful activity is not adequately countered by the Administration's suggestions of possible employment. The word 'any' must be read in the light of what is reasonably possible, not of what is conceivable. The statute must be given a reasonable interpretation. It is a remedial statute and must be construed liberally. It was not the intention of Congress to impose a test so severe as that required by the Secretary and to exact as a condition precedent to the maintenance of a claim the elimination of every possibility of gainful employment." This language was quoted with approval in Kohrs v. Flemming, supra.

---

**9.** See Adams v. Flemming, 2 Cir., 1960, 276 F.2d 901, 904, footnote 3, and cases there discussed; cf. Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492.

# 373

In Jacobson v. Folsom, supra, Judge Kaufman was confronted with a case involving a cardiac patient where the evidence showed the plaintiff had been an insurance salesman and had made a few sales under a special license after retirement. The court said, "It further appears from the record of the hearings and from a referee's subsequent decision that undue weight was placed upon the few sales made by plaintiff under his special license. In view of the very limited commercial activity of plaintiff after his affliction, a determination with respect to such activity consistent with a finding of permanent and total disability may very well have been made. An understanding of human nature reveals that a person may attempt such sporadic and limited work not because of his ability to work but because of his unwillingness to live a life of idleness even though he be totally and permanently disabled within the meaning of Section 216(i). See Berry v. United States, 1941, 312 U.S. 450, 455–456, 61 S.Ct. 637, 85 L.Ed. 945." [158 F.Supp. 285.]

It is apparent that the referee here, as in Aaron v. Flemming and other cases supra, "gave too strict an application to 'disability'". There was no substantial evidence, medical or otherwise, which does not tend to corroborate plaintiff's claim that he was unable to engage in "any substantial gainful activity". Plaintiff was forty-nine years of age when he sustained his first heart attack and fifty-six at the time of the hearing before the referee. He had completed the seventh grade in school. He had worked as an electrician and there is no evidence that he was qualified to follow any other less active occupation. The referee found that, at the time of the hearing, he was able to drive a car, "prepare meals, keep up his apartment and do a little electrical work such as fix a switch or light socket". This is not substantial evidence to support a conclusion that he was able to engage in any substantial gainful activity.

Upon a review of the entire record, I must conclude that there is no substantial evidence to support the referee's decision. Defendant's motion for summary judgment is denied and the decision of the Secretary is reversed. Pursuant to Rule 11(b) of the local rules of court, plaintiff will prepare and file draft of appropriate judgment.