Sam NARROL, Appellant,

v.

Margaret M. HECKLER, Secretary, Department of Health and Human Services.

No. 82–1827.

United States Court of Appeals, District of Columbia Circuit.

Argued March 23, 1983.

Decided Feb. 24, 1984.

Steven M. Schneebaum, Washington, D.C., with whom Thomas D. Roberts and Michael R. Schuster, Washington, D.C., were on brief, for appellant.

John C. Martin, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time brief was filed, Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before ROBINSON, Chief Judge, WILKEY, Circuit Judge, and BAZELON, Senior Circuit Judge.

Opinion PER CURIAM.

PER CURIAM:

This case involves an appeal from a judgment of the U.S. District Court for the District of Columbia dismissing appellant's action for review of a final decision by the Secretary of the Department of Health and Human Services denying appellant's claim for disability benefits under the Social Security Act. Because we find that appellant was denied a fair hearing at the administrative level, we vacate the judgment of the district court and remand for further proceedings.

### BACKGROUND

Appellant, Sam Narrol, age 62, co-owned and operated a small printing business in New York City for twenty-two years. Mr. Narrol now suffers from a horrible range of illnesses: Parkinson's disease, a herniated disc (causing pelvic pain), sciatica (causing severe pain on his right side), and cataracts on both eyes (causing blurring of vision). Although the Parkinson's disease is under control with the drug Sinemet, Narrol continues to exhibit many of the classic traits of the disease—a shuffling walk, impaired coordination, stumbling and falling. In addition, Narrol claims that the drugs he takes for Parkinson's and sciatica cause severe blurring of vision upon any sustained period of close reading and may have con-

tributed to the development of his cataracts.

From the time his Parkinson's disease was diagnosed in 1975, Narrol's ability to perform his functions at work gradually deteriorated. By 1979, he was able to put in only a few hours a day. He was no longer able to drive, and commuting on the New York subway system had become a nightmare; his instability often caused him to fall. At work, his duties consisted primarily of billing, proofreading, and proof-press operation. His blurred vision rendered proofreading and billing most difficult. Moreover, sitting for a sustained period of more than fifteen to twenty minutes not only was painful but also frequently caused him to fall when he rose. He attempted to alternate periods of sitting and standing by adding to his duties the operation of a proof-press—a heavy piece of machinery requiring use of his legs—but was unable to perform this function for more than five minutes at a time due to severe pelvic pain. Finally, one day in late 1979, Narrol, heeding the urgings of his partners, simply stopped going into work.

Narrol's subsequent application for Social Security disability benefits was denied. Narrol then requested and received a hearing before an administrative law judge (ALJ). Although he had been advised of his right to representation by counsel at his own expense, Narrol was not represented by an attorney but was assisted only by his friend and former business partner, Kenneth Webster. At the hearing, both Narrol and Webster testified as to the nature of Narrol's disability and its effects on his ability to perform the functions of his job. The written evidence in favor of Narrol included medical reports filed by his neurologist, Dr. Melvin Yahr, his internist, Dr. Allan Aronson, and his ophthamologist, Dr. Gerald Pierce. Dr. Yahr's reports, though tersely worded, described Narrol's symptoms of Parkinson's disease as well as his adverse reactions to his medications and concluded that it was "unknown" when Narrol would be able to return to work. App. 130, 134–36. Dr. Aronson, who regularly followed Narrol for high blood pressure, observed that Narrol's

> main disability which is a very obvious one, is from his Parkinson's Disease— which is undoubtedly severe .... There is no question in my mind that his Parkinson's Disease entitles him to a complete disability. He has difficulty in walking in my office, he shuffles and has all the classical signs of Parkinson's Disease.

App. 121. Dr. Aronson concluded that Narrol was "not in any way capable of carrying on an occupation." App. 113. The ophthamologist reported that Narrol's visual acuity was correctable to 20/50 in the right eye and 20/30 in the left but that Narrol suffered from early cataracts in both eyes. App. 129, 131. · In addition to the medical reports, the written record before the ALJ contained a list of the medications Narrol was taking, App. 133, as well as the reports of the Social Security Contact Representatives who had interviewed Narrol, indicating their personal observations of his difficulty in sitting and walking. App. 88, 96, 101.

The only piece of evidence against Narrol was the written report of a consultative neurological examination performed on contract to the New York State Bureau of Disability Determinations (the Disability Bureau) by Dr. Gary Korenman. Dr. Korenman reported that Narrol's "[g]ait, pallor and coordination are normal" and that his "[e]xtraparamital disorder [is] under excellent control with Sinemet." App. 116. Dr. Korenman also completed a "Residual Functional Capacity Evaluation," in the form of a checklist preprinted by the Disability Bureau, in which he indicated that Narrol was capable of sitting for eight hours a day, standing and walking for six hours, lifting and carrying over fifty pounds, and frequently bending, squatting, crawling, and climbing. App. 118.

Placing nearly exclusive reliance upon Dr. Korenman's evaluation, *see* App. 39–40, the ALJ found that

> claimant's residual functional capacity is consistent with sedentary and light physi-

cal activity. Since his former job involved sedentary and light physical activity, there is no impairment shown in this case which, either singly or in combination, has prevented or would prevent the claimant, for a continuous period of 12 months, from returning to his former work doing billing, telephone work and proofreading where he had the option to sit or stand at will. Accordingly, the claimant is found "not disabled" as defined in the Social Security Act.

App. 41. The findings of the ALJ were affirmed by the Appeals Council of the Social Security Administration. Narrol's subsequent complaint seeking review of the Administration's determination was dismissed by the district court following cross-motions for summary judgment.

## DISCUSSION

▮ The federal regulations prescribing the conduct of disability hearings that were in force at the time Narrol's hearing was held required that the "presiding officer . . . inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." 20 C.F.R. § 404.927 (1980). Thus, the ALJ had an affirmative duty "to investigate fully all matters in issue, and to develop the comprehensive record required for a fair determination . . . . This duty to probe and explore scrupulously all the relevant facts is particularly strict when the claimant, as here, is not represented by an attorney." *Diabo v. Secretary of Health, Education and Welfare,* 627 F.2d 278, 281–82 (D.C.Cir. 1980); *see Cutler v. Weinberger,* 516 F.2d 1282, 1286 (2d Cir.1975); *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 43 (2d Cir.1972); *Clemmons v. Weinberger,* 416 F.Supp. 623, 625 (W.D.Mo.1976). The ALJ in this case failed in several respects to fulfill this duty to probe and bring out the evidence.

▮ Most glaring among the defects in the ALJ's decision was the judge's failure to explore evidence casting doubt upon the results of the Disability Bureau's consulta-

tive examination. The ALJ's opinion dispositively relied on the findings of Dr. Gary Korenman, the doctor under contract to the Bureau, who found Narrol fully capable of continuing on the job. At the hearing, Narrol strenuously objected to the admission of Dr. Korenman's report, arguing that Dr. Korenman had no basis for his findings. Narrol testified that Dr. Korenman saw him for about fifteen minutes during which time the doctor never saw him walk. Although Dr. Korenman had Narrol perform some finger exercises, the doctor never had him lift anything or get up and walk around so that his gait and coordination could be observed. App. 51–53. Nevertheless, Dr. Korenman reported not only that Narrol's gait and coordination were normal, but that in the course of an eight-hour day Narrol could sit for eight hours, stand for six hours, walk for six hours, frequently bend, squat, crawl, and climb, and periodically lift fifty-pound weights. Nothing in the report itself indicates *how* the doctor arrived at these conclusions. However, the ALJ failed to discuss this issue at all, simply taking the report at face value.

The suspicious character of Dr. Korenman's assessment of Narrol's physical abilities is reinforced by the fact that it contradicts every other scrap of evidence in the record. Narrol's two doctors submitted reports showing that he had tremendous difficulties in walking and sitting. Because those doctors had much greater familiarity with Narrol's condition, their reports should have been accorded substantial weight. *Fruge v. Harris,* 631 F.2d 1244, 1246 (5th Cir.1980). Yet, the ALJ either mischaracterized or ignored many of their findings, and he gave no reason for accepting Dr. Korenman's report as more probative than those of Narrol's doctors. Moreover, the ALJ ignored the testimony of Narrol and his business partner. Their testimony painted a grim picture of a man wracked by disabling pain, of a man who frequently could barely stand, of a man who simply could not function any more. Courts have demanded that such testimony be given serious and fair consideration. *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir.1981). The

ALJ gave no reason for discounting this testimony but apparently gave it little weight. Finally, the observations of the Social Security Contact Representatives indicated that Narrol's coordination and his ability to walk and to sit for more than a few minutes at a time were markedly impaired. This evidence too was entirely ignored in the ALJ's opinion.

The ALJ also failed to probe adequately the evidence concerning Narrol's blurred vision. Roughly half of Narrol's work duties consisted of proofreading and billing, both of which involve close reading. Narrol testified that blurred vision prevented him from performing these functions; he stated that the problem could have been caused either by his cataracts or by the five medications he was taking. Although the ophthamologist's report indicated that Narrol's visual acuity was correctable to 20/50 on the right and 20/30 on the left, it indicated that Narrol had early cataracts in both eyes with recent progression in the right eye. App. 131. Narrol also submitted in evidence a list of five medications he was required to take regularly at the time of the hearing. App. 133. Had he consulted the standard medical reference materials, the ALJ would have discovered that four of the five medications Narrol was taking are capable of causing blurred vision or visual disturbances. PHYSICIAN'S DESK REFERENCE 630, 1263, 1305, 1334 (1983). Yet the ALJ apparently did not investigate this evidence of blurred vision; instead, he found that Narrol had "adequate visual acuity" and was therefore capable of proofreading.

Finally, the ALJ's opinion reflects a lack of understanding of the demands of Narrol's job and the implications of Narrol's *combination* of disabilities for his ability to perform that job. For example, the ALJ relied in part upon Narrol's freedom to sit or stand at will while working, yet never mentioned that Narrol was required to operate a heavy piece of equipment, the proof-press, while standing. Neither did the ALJ mention that sciatic pain and pelvic pain (apparently from the herniated disc) prevented Narrol from operating the proof-press for more than a few minutes at a time. The ALJ observed that a treating physician had reported a diagnosis of the herniated disc, but continued, "[t]here are no objective medical findings to substantiate the diagnosis." App. 40–41. If the ALJ required further evidence of the herniated disc or of its effect on Narrol's residual functional capacity, he could have informed Narrol of the need to submit further documentation. 20 C.F.R. § 404.944 (1983) (ALJ may stop hearing temporarily and continue it at later date if he or she believes there is material evidence missing at hearing). Instead, he apparently totally discounted the existence of the herniated disc and concluded, in the face of testimonial evidence to the contrary, that Narrol could continue to perform certain aspects of his job while standing without describing what those aspects might be.

CONCLUSION

For the reasons expressed above, we vacate the judgment below and remand the case to the district court for remand in turn to the Secretary of the Department of Health and Human Services. The Secretary should be instructed to rehear this case at which time the adequacy of the consultative physician's report should be fully explored. In addition, the law judge on rehearing should obtain additional information concerning Narrol's symptoms of blurred vision, his herniated disc, and his sciatic pain, and should explore the effect of these conditions, in combination with the Parkinson's disease, upon Narrol's ability to get to, and perform the full spectrum of functions of, his job.

*Vacated and remanded.*