**Theodore S. FULWOOD, Plaintiff,**

**v.**

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 84–1252.**

United States District Court, District of Columbia.

Sept. 27, 1984.

Mona M. Murphy, Arlington, Va., for plaintiff.

James N. Owens, Asst. U.S. Atty., Royce C. Lamberth, Asst. U.S. Atty., Joseph E.

diGenova, U.S. Atty., Washington, D.C., for defendants; Donald A. Gonya, Randolph W. Gaines, Mary Gludt; Social Security Division, Dept. of Health and Human Services, Baltimore, Md., of counsel.

CHARLES R. RICHEY, District Judge.

## INTRODUCTION

This action is brought under 42 U.S.C. § 405(g) to review a final decision of the Secretary of Health and Human Services denying Plaintiff's application for disability insurance benefits under Title II of the Social Security Act (Act), and denying Supplemental Security Income benefits under Title XVI of the Act. Upon consideration of Plaintiff's Motion for Judgment on the Pleadings, Defendant's Motion for Judgment of Affirmance, memorandum in support thereof and opposition thereto, and the entire record herein, the Court, for the reasons stated below, reverses the Secretary's decision.

## BACKGROUND

Plaintiff, Theodore Fulwood, is a 58 year-old black male with a seventh grade education. He is a former maintenance engineer for a commercial laundry in Washington, D.C., where he worked for 34 years until he was discharged without a pension in February of 1981. Plaintiff testified that he was terminated for not appearing for work, even though he was ill, and called in every day (R. 79, 80).

Plaintiff suffers from a plethora of ailments, including, but not limited to, hypertension, asbestosis, (which he contracted at his former place of employment where he was regularly exposed to asbestos dust (R. 249)), diabetes, chronic lumbosacral strain, dypsnea, alcoholism, cirrhosis of the liver, chronic renal failure, alcoholic anemia, alcoholic hepatitis, gall stones, ulcers, and pericarditis. Psychologically, Plaintiff suffers from anxiety episodes, fear of dying, and relationship dysfunction. These psychological problems stem from the loss of his job, the death of his brother by asbestosis in 1978 (his brother had worked alongside him

at the laundry (R. 245–246)), the more recent death of his wife in March of 1983, and the burden of his physical illnesses.

As a result of his ailments, Plaintiff claims that he cannot walk any further than a few blocks or climb more than a couple flights of stairs without experiencing shortness of breath and extreme fatigue (R. 56, 58, 63). In addition, he has dizzy spells (R. 58) and has to lie down often (R. 63), his heart races for no apparent reason (twice, in fact, he had to visit an emergency room due to this (R. 59)), he gets headaches that last for days (R. 60), experiences weakness in the arms and numbness and pain in the legs and feet (R. 337) limiting his ability to stand to not more than thirty to forty-five minutes (R. 57), and he experiences chest tightness, nose bleeds, (R. 60), and night sweats. (R. 317–318).

Although Plaintiff lives alone and generally takes care of himself, he also has frequent help from relatives in performing such chores as cooking and shopping (R. 72, 317). For the most part, Plaintiff stays at home, occasionally getting out to attend church on Sunday and visit the sick and shut-ins (R. 74–76). At the time of the hearing before the Administrative Law Judge (ALJ), Plaintiff stated that he was without income but had an application for general public assistance pending (R. 80–81).

Plaintiff initially filed a claim for disability benefits in May of 1981 but that claim was denied. Plaintiff did not have an attorney at that time and did not appeal the denial. In May of 1982 Plaintiff again filed for disability benefits and again his claim was denied. This time, however, Plaintiff had retained counsel and the decision was appealed. In June of 1983 the case was heard by an Administrative Law Judge. In July of 1983 the ALJ issued a decision, finding that Plaintiff was capable of doing "light or sedentary" work and was, therefore, not disabled within the meaning of the Social Security Act and not entitled to any disability benefits. Plaintiff requested a review of the decision by the Social Se-

curity Agency Appeals Council, which request was denied on February 16, 1984 because the Council believed that the ALJ's decision was supported by substantial evidence. Plaintiff filed his complaint in this court on April 23rd, 1984.

## I. THE ALJ ERRED AS A MATTER OF LAW BY INCORRECTLY ALLOCATING THE BURDEN OF PROOF

To establish a disability as defined by the Act, the initial burden is on the Plaintiff to show that he suffers from an impairment that is severe enough to preclude him from engaging in his past work. The burden then shifts to the Secretary to show that there exists other substantial gainful employment which Plaintiff could perform in view of his age, education, work experience, and residual functional capacity. *e.g., Meneses v. Secretary of HEW*, 442 F.2d 803, 806 (D.C.Cir.1971); *Stephens v. Secretary of HEW*, 603 F.2d 36, 41 (8th Cir. 1979).

In this case, it is undisputed that Mr. Fulwood successfully demonstrated that he had a severe impairment which precluded him from continuing in his former employment. Nevertheless, the ALJ stated: "For the claimant to be successful, he must establish the inability to do suitable work in consideration of his age, education, work background, and residual functional capacity." (R. 52). As shown above, the burden of showing the ability of the claimant to perform other substantial gainful employment is on the government alone. This statement by the ALJ, however, shows that the ALJ never shifted that burden of proof to the government. Thus, the ALJ erred as a matter of law by incorrectly placing the burden of proof upon the Plaintiff throughout the entire proceeding.

## II. PLAINTIFF'S ABILITY TO CARE FOR HIMSELF AND THE FACT THAT HE RECENTLY SOUGHT WORK DOES NOT NEGATE HIS CLAIM OF DISABILITY

 Although Plaintiff lives alone, does a minimum of his own shopping and cooking, occasionally drives an automobile, visits relatives, serves as a deacon at his church (a largely ceremonial function) (R. 74–76), and has recently sought work (R. 98), this does not negate his credibility in claiming that he was "disabled" within the meaning of the Social Security Act. Merely because an individual is somewhat mobile and can perform some simple functions, such as driving, dishwashing, shopping, and sweeping the floor, does not mean that he is able to engage in substantial gainful activity. *Smith v. Califano*, 637 F.2d 968, 971–972 (3d Cir.1981); *Yawitz v. Weinberger*, 498 F.2d 956, 960 (8th Cir.1974); *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir.1967); *Buzzeo v. Harris*, 486 F.Supp. 690, 693 (S.D.N.Y.1980); *Joki v. Flemming*, 189 F.Supp. 365, 372 (D.Mont.1960). These tasks can be performed intermittently, when the individual is not experiencing severe symptoms, and do not require the sustained effort necessary for any substantial, sustained and regular gainful employment. Mr. Fulwood himself testified that whether he engages in church, family, or social activities depends upon how he feels physically (R. 77, 82). The ALJ's finding that Mr. Fulwood's performance of these activities renders his disability claim not credible is illogical and simply runs counter to common sense under the facts of this case.

Likewise, the fact that Mr. Fulwood had recently sought work does not reflect poorly on his claim of disability. That a claimant has recently sought work is immaterial to a determination of whether he qualifies for disability benefits. *Bartell v. Cohen*, 445 F.2d 80, 82 (7th Cir.1971). If anything, this fact, taken together with Plaintiff's 34 years of service at his former place of employment, only demonstrates that Mr. Fulwood is not a malingerer.

## III. THE ALJ DID NOT GIVE THE PROPER EVIDENTIARY WEIGHT TO THE MEDICAL RECORDS BEFORE HIM

Among the evidence considered by the ALJ in reaching his conclusion that Mr.

Fulwood could perform light and sedentary work were several reports from medical examiners. None of these reports, however, stated that Mr. Fulwood was physically and psychologically capable of even performing light or sedentary work. Only one report—that which was prepared by Plaintiff's personal treating physician, Dr. Kenneth A. Chase—contained an opinion regarding Mr. Fulwood's ability to work. In that report Dr. Chase stated that the likelihood of Mr. Fulwood obtaining substantial gainful employment was "extremely unrealistic." (R. 314).

■ Not only was Dr. Chase the Plaintiff's personal treating physician, but he had also examined Plaintiff over a long period of time. Conversely, the other doctors were not treating physicians and had only examined Plaintiff over short time spans. The ALJ is required to give greatest weight to evidence of a personal, treating physician, particularly when the consultation has been over a considerable length of time, unless this is clearly outweighed by conflicting evidence of other qualified examining physicians. *See Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981); *Gold v. Secretary of HEW*, 463 F.2d 38, 42 (2d Cir.1972). In addition, Dr. Chase based his opinion on an assessment of the totality of Mr. Fulwood's ailments, while the other doctors only examined Plaintiff concerning isolated ailments. Medical reports which are based on a totality of the claimant's impairments are entitled to substantial weight. *Narrol v. Heckler*, 727 F.2d 1303, 1306 (D.C.Cir.1984). Finally, Dr. Chase's report stating that Plaintiff's chances at employment were extremely unrealistic, is the most recent medical report analyzing Mr. Fulwood's condition.

■ An example of how the ALJ improperly allocated the evidentiary weight in this case is shown through his analysis in comparing the medical reports of Dr. Chase with that of Dr. Philip Witsorche, an expert for an insurance company liable for a worker's compensation claim by Plaintiff. From a review of the ALJ's decision, it appears that the ALJ compared the two doctors'

reports on equal footing and chose to give greater credibility to the report of Dr. Witsorche. A short review of the facts, however, show that this was improper. In March of 1980, Dr. Chase examined Plaintiff and issued a report stating that Plaintiff suffered a 25% disability as a result of asbestosis alone (R. 247). Approximately one month later, in April of 1980, Dr. Witsorche also examined Plaintiff and issued a report stating that Dr. Chase's estimate of a 25% disability from asbestosis was a "considerable overestimate." (R. 252). However, Dr. Witsorche repeatedly stressed that his opinions were preliminary in nature due to incomplete records (R. 248, 252–53). In addition, Dr. Witsorche cautioned that "further studies ... might reveal a greater degree of impairment." (R. 252). In any event, the importance of the disparity between the estimates of Drs. Chase and Witsorche is minimized by the fact that even Dr. Chase acknowledged that in March of 1981, Plaintiff was under "no apparent distress." (R. 185).

What is more important is Dr. Chase's examination of Plaintiff which took place more than three years later, in May of 1983. It was at that time that Dr. Chase, in considering the totality of Plaintiff's ailments, issued his report stating that Plaintiff's chances at gainful employment were "extremely unrealistic." (R. 314). There is no other report in the record by any doctor, including Dr. Witsorche, that was made at, or near, this same time. Furthermore, Dr. Susan Daum—a specialist in occupational medicine who evaluated Plaintiff in February of 1982 for his respiratory problem—noted that asbestosis is a progressive disease (R. 289). Thus it is clear that Dr. Chase's report of May 1983 when taken together with Dr. Daum's comments, has far greater relevance to Plaintiff's actual and total condition today than does Dr. Witsorche's report of April 1980. Finally, the fact that Dr. Witsorche was an expert for an insurance company liable for a worker's compensation claim by Plaintiff, makes Dr. Witsorche nothing more than a hired-gun whose credibility is to be questioned.

It was serious error to compare his report on equal footing with that of Plaintiff's long-time treating physician.

## IV. THE ALJ'S CONCLUSION THAT PLAINTIFF'S DIABETES, HYPERTENSION, AND ALCOHOLISM WERE EITHER NON–EXISTENT, MILD, · OR WELL CONTROLLED, WAS NOT BASED UPON SUBSTANTIAL EVIDENCE

■ It is well settled that if the Secretary's decision regarding Plaintiff's disability is supported by substantial evidence, it must be affirmed by this Court. 42 U.S.C. § 405(g). *Richardson v. Peralis*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Id.* at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

■ Doctors' reports and hospital records show that Mr. Fulwood's diabetes is *not* well controlled. (*See, e.g.*, R. 213, 220, 270, 285, 348, 320). Numerous abnormal glucose readings appear in laboratory reports of Plaintiff's blood test results. (*See, e.g.*, R. 224, 238, 239, 276, 307, 322, 323, 346, 347). Indeed, Plaintiff was noted to have experienced hypoglycemic reactions requiring an adjustment of insulin in November, 1982. (R. 344).

Dr. R. Sion, a public health doctor to whom the Plaintiff was referred when he could no longer afford the private services of Dr. Chase (R. 62, 80), has treated Plaintiff for diabetes, and on March 8, 1983, Dr. Sion diagnosed this condition as "uncontrolled" (R. 320). Although the ALJ cited a 1981 consultative report by Dr. Jerome Putnam in which Dr. Putnam stated that Plaintiff's diabetes was well controlled (R. 36), this report must be outweighed by that of Dr. Sion which was made at a much later date and by a doctor who was, again, a long-time personal treating physician. *Perez, supra, Gold, supra.*

With respect to Plaintiff's hypertension, hospital records and reports show that it too is *un*controlled. (R. 258, 264). Even Dr. Putnam—the consultative doctor who examined Plaintiff at the behest of the Social Security Administration and whose report the ALJ cited (R. 36)—stated that Plaintiff's hypertension is under "poor control." (R. 36).

Furthermore, it appears that the ALJ dismissed the possibility that Mr. Fulwood was disabled by reason of alcoholism. This conclusion appears to rest solely upon the basis that Mr. Fulwood underwent a detoxification program in 1979 (R. 353) and upon Plaintiff's testimony that he had quit drinking in 1980 (R. 36, 37) and is now a member of Alcoholics Anonymous (R. 61). In *McShea v. Schweiker*, 700 F.2d 117 (3d Cir.1983), however, where the claimant had also denied his alcoholism, the Court held that the ALJ erred in not going beyond the claimant's own testimony, stating that denial is a common phenomenon of the disease. *Id.* at 119. Similarly, in *Ferguson v. Schweiker*, 641 F.2d 243 (5th Cir.1981), the Court held that the ALJ erred in finding that the claimant had the voluntary ability to control the use of alcohol where the only evidence was that the claimant had once undergone detoxification and had testified that he only drank "once in a while" and had quit once. *Id.* at 249. As in *McShea* and *Ferguson*, the ALJ here should have, but did not, look beyond Plaintiff's testimony.

■ The record in this case is replete with evidence tending to show that Plaintiff suffers from chronic alcoholism. Mr. Fulwood suffers from such indicative symptoms as cirrhosis of the liver (R. 182, 284, 285, 314, 329), chronic renal failure (R. 224–244, 266, 276, 314, 322–323, 347), liver and kidney dysfunction (R. 186, 198, 199, 201, 202, 204, 211, 216, 217, 224–244, 256, 266, 268, 270, 271, 276, 314, 319, 321, 322–323, 343, 347, 348), alcoholic anemia (R. 184, 185, 201, 202, 314). Along these lines it is important to note that Plaintiff's most recent emergency room treatment for alcohol abuse was only ten days prior to the

ALJ's hearing (R. 348). It is well settled that a claimant's inability to voluntarily control the use of alcohol is a disabling disease within the meaning of the Act. *McShea, supra,* at 118–19, *Ferguson, supra,* at 248, *Griffis v. Weinberger,* 509 F.2d 837, 838 (9th Cir.1975).

■ Once evidence of the claimant's alcoholism has been introduced, the ALJ has an affirmative duty to order further inquiry or a consultative examination. *Hicks v. Califano,* 600 F.2d 1048, 1051 (4th Cir.1979), *McShea, supra,* at 119. Furthermore, the ALJ is obliged to reconcile relevant probative evidence that conflicts with his conclusions. *Milazzo v. Schweiker,* 528 F.Supp. 1099, 1102 (E.D.Penn.1981). In the instant case, the ALJ simply failed to carry out either of these duties.

## V. THE ALJ VIOLATED HIS DUTY TO CONSIDER ALL OF PLAINTIFF'S IMPAIRMENTS OF WHICH HE BECAME AWARE

■ The ALJ has an affirmative duty to explore *all* of Plaintiff's impairments of which he becomes aware. *Narrol v. Heckler,* 727 F.2d 1303, 1306 (D.C.Cir. 1984). As noted above, only Dr. Chase rendered an opinion which was based on a combination of all of Plaintiff's ailments. Nevertheless, the ALJ appears to have discounted Dr. Chase's report. In addition, it appears that the ALJ impermissibly discounted the evidence of Plaintiff's alcoholism. Finally, the ALJ did not even implicitly, let alone explicitly, note Plaintiff's psychological ailments in his decision. Such psychological impairments were clearly laid out in the medical report of Dr. Behrman, which is part of the record now on review (R. 352, 317–318). Under relevant law, the ALJ must consider both physical and psychological impairments in determining a claimant's eligibility for disability benefits. *See, e.g., Poe v. Harris,* 644 F.2d 721, 723 (8th Cir.1981). It is clear that in this case, the ALJ failed to properly consider and explore that which the law required him to.

## VI. PLAINTIFF WAS DENIED A FAIR HEARING IN THAT THE ALJ INTERFERED WITH PLAINTIFF'S PRESENTATION OF HIS CASE IN A PARTISAN MANNER

A review of the transcript of the hearing before the ALJ in this case, reveals that the ALJ questioned Plaintiff in a brusque, bullying manner, answered questions for him when the answer did not come quickly enough, drew conclusions unwarranted by Plaintiff's actual answers, and interrupted questions put by Plaintiff's attorney. (*See, e.g.,* R. 55, 64, 65, 66, 72, 78, 81–82, 87, 88). The following colloquys are indicative of the hearing as a whole:

RE–EXAMINATION BY ATTORNEY:

Q Mr. Fulwood, just a couple—

ALJ: Do you have some questions?

ATTORNEY: I just want a couple of clarifying questions.

ALJ: Okay. I don't want any repetition, and I don't want any argumentation type questions.

ATTORNEY: Okay.

BY ATTORNEY:

Q Mr. Fulwood, I would just like to clarify one point. You said you'd been as a—deacon, you had visited the hospital once in the past year?

A I would say so.

Q Okay. I just wanted to—to—

RE–EXAMINATION BY ALJ:

Q Well, while you're on that, once or more than once? Of course, you, if you're going to visit them at all, it would be at least one time.

A Well, I say at least once.

Q At least once?

A Right.

Q It could have been more than once?

A It could have been.

Q It could have been several times.

A Well, that—that—you know, it—

ALJ: All right. That's an inconsequential point, I really think.

ATTORNEY: Okay. I—

ALJ: He gets around. Let's go. He has gotten around. Let's put it that way.

ATTORNEY: I don't have any—

ALJ: To church.

ATTORNEY: —Further questions of him at this point.

ALJ: You don't have any, right?

ATTORNEY: Right.

ALJ: Very good. (R. 87, 88)

———

BY ALJ:

Q So you say you're without funds. Are you borrowing money from your friends?

A Yes, I am.

Q So you must visit your friends then, if you're going to borrow money from them. You certainly would want to go around and say, "Hello," to them from time to time.

A Oh, I certainly would.

Q I asked you if you did that, and you indicated you only saw them at church.

A I was only referring to the church people. I'm not talking—

Q I said friends.

A —about relatives.

Q I said friends and relatives. All right. I'll put relatives into the question. You do visit friends and relatives then?

A Well, mostly relatives, yes.

Q Uh-huh. How do you get to seem them? Travel.

A Well, they come to see me, the same ones—

Q Do you—Do you ever go to see them?

A When I feel like it, when I'm up to it.

Q And how do you get there?

A (No response).

Q Bus? Walk?

A No, I have a car.

Q Oh, you have an—

A But I don't—

Q —automobile?

A —drive it most of the time.

Q Oh, I don't know whether I—

A No one's asked that question.

Q I see. I asked it now. You have a car. What kind is it?

A It's a 1973 Thunderbird.

Q Thunderbird?

A Yes. (R. 81, 82)

———

Initially the Court notes that the ALJ's mischaracterization of Plaintiff's testimony by skewing Plaintiff's answers in an unfavorable light makes the ALJ's findings questionable. *Brown v. Secretary of HEW*, Unemp.Ins.Reptr. (C.C.H.) ¶ 17,336 (E.D.Mich.1980). The tenor of the ALJ's questions are clearly shown to be not that of a neutral fact-finder but one of an advocate with a predetermined mind destined to reach a predetermined result.

 The ALJ's role in a disability benefits hearing is analagous to that of a trial judge, for whom it is clearly improper to interfere with the questioning of a witness, particularly when it is done in a partisan manner. *See, Gomila v. United States*, 146 F.2d 372, 374–75 (5th Cir.1944); *See also United States v. Hickman*, 592 F.2d 931, 934 (6th Cir.1979); *United States v. D'anna*, 450 F.2d 1201, 1206 (2d Cir. 1971); *Bursten v. United States*, 395 F.2d 976, 983 (5th Cir.1968). Such conduct constitutes a denial of a party's procedural due process right to a fair and impartial hearing, which is required in administrative proceedings under the Social Security Act. *Richardson v. Peralis*, 402 U.S. 389, 400, 91 S.Ct. 1420, 1426 (1971). The Court concludes that the ALJ in this case, by constantly interrupting Plaintiff and his counsel, not permitting Plaintiff to present his case, and questioning Plaintiff in a partisan manner, transgressed the bounds of judicial propriety.

## CONCLUSION

The Court is mindful that in reviewing the decision of the Secretary, its role is

limited. The Court may not "decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Secretary," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983), and the Court has not done so here. A close examination of the record in this case clearly shows that Plaintiff suffers from a number of ailments which, in combination, have rendered him disabled within the meaning of the Social Security Act. There is no other reasonable conclusion. Not only did the ALJ in this case fail to base his findings upon substantial evidence, but he also committed plain error in the application of several well-settled principles of law. For the foregoing reasons, this Court reverses the Secretary's decision. Judgment shall be entered in favor of the Plaintiff, granting Plaintiff retroactive Social Security Disability Insurance and Supplemental Security Income Benefits dating from May 10, 1982, the day on which Plaintiff's second application for disability benefits was filed. Accordingly, this case is remanded to the Defendant for a determination of the amount of benefits due, retroactive to May 10, 1982, and consistent with the judgment above. Meanwhile, the case will stand dismissed from the dockets of this Court.